UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| MARGARET E. HUSKEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 4:18CV1654 RLW |
| | ) |
| ANDREW M. SAUL, | ) |
| Commissioner of Social Security,[1] | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the application of Plaintiff Margaret E. Huskey for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. § 401, *et seq.* Because the Appeals Council denied Plaintiff's Request for Review, the decision by the Administrative Law Judge ("ALJ") is the final decision of the Commissioner. Plaintiff has filed a Brief in Support of Complaint (ECF No. 12), and the Commissioner has filed a Brief in Support of the Answer (ECF No. 17). For the reasons set forth below, the Court affirms the decision of the Commissioner.

### I. Procedural History

Plaintiff protectively filed an application for DIB on August 31, 2015. In the application, she alleged disability beginning February 1, 2014. (Tr. 147-54) Plaintiff's claims were denied

---

[1] Andrew M. Saul is now the Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew M. Saul should be substituted for Acting Commissioner Nancy A. Berryhill as the Defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

on November 10, 2015 (Tr. 81), and she filed a request for a hearing before an ALJ (Tr. 89). On July 25, 2017, Plaintiff testified at a hearing before the ALJ. (Tr. 29-61) The day prior to the hearing, Plaintiff amended her alleged onset date of disability to April 16, 2015. (Tr. 169) In a decision dated January 11, 2018, the ALJ determined Plaintiff had not been under a disability from April 16, 2015 through December 31, 2016, the date on which Plaintiff last met the insured status requirements of the Social Security Act. (Tr. 15-24) On August 15, 2018, the Appeals Council denied Plaintiff's request for review. (Tr. 1-4) Thus, the ALJ's decision stands as the final decision of the Commissioner.

## II. Evidence Before the ALJ

At the July 25, 2017 hearing before the ALJ, Plaintiff appeared with counsel. In counsel's opening statement, he stated Plaintiff was 61 years old at the time and had obtained a high school education. She had primarily performed clerical office work, which counsel described at sedentary and unskilled, at Anheuser-Busch ("AB") until she was laid off. Plaintiff had also performed some unpaid babysitting for her grandchild, which ended April 2015. (Tr. 29-34)

Counsel stated Plaintiff's main severe impairments were atrial fibrillation ("AFib"), chronic obstructive pulmonary disease ("COPD"), sleep apnea, right shoulder AC joint arthritis and tendinitis, either labrnythitis or vertigo, and a recent diagnosis of depression with her primary care physician. Prior to June 2015, Plaintiff had visited the hospital numerous times for shortness of breath, coughing, chest congestion, and dizziness. Counsel suspected these visits were the early episodes of AFib, later diagnosed on April 16, 2015 (the onset date). Counsel further stated that medical personnel have utilized cardioversion on multiple occasions to restore Plaintiff's heart rate back to normal rhythm. Her cardiologist has said she is probably still in

- 2 -

AFib but with a stable heart rate with medicine. Counsel noted Plaintiff's heart rate is typically between 60 and 80 beats per minute. He conceded her rate is "not really, really high when she's in the cardiologist's office" and that her cardiologist has said her rate is "stable without symptoms." Nevertheless, counsel said Plaintiff would testify her significant symptoms were related to her heart or lungs. (Tr. 34-35)

Counsel next commented on Plaintiff's COPD for which she uses a nebulizer. He previewed a pulmonary functions study performed on Plaintiff's lungs in April 2015. However, counsel noted it was "probably done during a period of exacerbation. So I'm not sure we can rely on that listing level, but it is quite severe." Counsel stated the combination of sleep apnea, AFib, COPD, and other symptoms has caused fatigue where Plaintiff experiences "lots of daytime sleepiness and very little energy." Counsel also commented on Plaintiff's arthritic condition on the cervical spine and right shoulder. Her doctor prescribed Vicodin and a wrist splint, but her work entering data exacerbated the condition until her layoff. Ultimately, counsel said Plaintiff would not be able to perform a full eight-hour workday because of dizziness, episodes of vertigo with bending because of her labrynthitis, and fatigue caused by sleepiness and sleep apnea. (Tr. 36-37)

Next, Plaintiff testified about her work history. She completed a ten-month program at a business college. Plaintiff had worked in ten to fifteen different positions for AB or a subsidiary since she was nineteen years old. She was laid off, along with approximately 1,5000 other employees, in 2011. Prior to her employment ending, Plaintiff had obtained two letters from her primary care physician, Dr. Robert Pozzi, restricting her work due to her difficulty staying awake along with her arthritis. Most of her work for AB was sedentary. Plaintiff testified that she had

broken her tail bone as a child, and an x-ray in adulthood revealed arthritis on her tail bone, as well, which prevented her from sitting for long periods. (Tr. 38-41)

Next, counsel examined Plaintiff. Plaintiff testified she believed her AFib began before it was diagnosed. She has always had a problem with her weight most of her adult life. She noted problem breathing for five to six years before her diagnosis. She contributed her coughing, pneumonia, and bronchitis to her being overweight. Plaintiff gets winded walking short distances and needs to take frequent breaks. She has walked for exercise in ten-minute intervals. She mostly stays inside. She does not do much shopping but does go to the grocery story with her husband. When she does shop, she walks at a slow pace and leans on the cart. Plaintiff is able to carry only lightweight bags of groceries. She gets dizzy if she bends over fast or makes fast, jerking head movements. When Plaintiff prepares meals, she takes breaks about every five minutes to rest. When sitting, she is constantly shifting positions. (Tr. 43-46)

Plaintiff testified that she and her husband had moved into a new house. Previously, she would do laundry in the basement and have to go up to the first and second floor to put items away. Now, they live in a one-story house. While the laundry is still in the basement, along with a child's play area, Plaintiff's husband does it and she puts it away after he brings it upstairs. (Tr. 46-47)

Plaintiff uses a nebulizer and other inhalers on a daily basis. She also uses a continuous positive airway pressure ("CPAP") machine every night "[w]ithout fail" for her sleep apnea. She frequently falls asleep watching TV, "at least once a day for sure." She also frequently sleeps during short car rides. She does not dust or vacuum her house often because she gets tired. She uses Facebook about once a week. She mostly uses her non-dominant left hand when checking emails. (Tr. 47-49)

Plaintiff has taken medication for depression, which was caused by her brother's recent death and stress related to the move into their new house. She said she does not do any social activities beyond spending about an hour and a half with her mother. Plaintiff has also been taking care of her husband who was undergoing cancer treatments after a transplant. If they have company over, they walk down to the nearby lake and ride their boat. Plaintiff also takes medicine for gout, which she says is effective. (Tr. 49-51)

Next, the ALJ asked additional questions to Plaintiff. She lives with just her husband. She still has a driver's license. She does not drive long distances but does drive to the small grocery mart inside their gated community. Her husband drives her to farther locations because she gets tired behind the wheel. In addition to falling asleep in the car and in front of the TV, Plaintiff has fallen asleep in the bathroom. Now, she only visits her mother about seven times a year. Plaintiff's siblings and children visit about once a month. She uses her smartphone to play games, about ten minutes a day before she loses focus. She almost never gets on their boat. Plaintiff's doctor gave her a CD with walking exercise instructions for ten-minute intervals. She has a Fitbit device to track her daily footsteps and typically walks around 2,000-2,500 steps. (Tr. 51-55)

A vocational expert ("VE") also testified at the hearing. The VE stated Plaintiff's prior positions at AB included accounting clerk, data entry clerk, supervisor, checker II, general office clerk, and supervisor over the data entry clerks. Plaintiff responded that she was the data entry clerk supervisor for four or five years until AB started taking work away due to her falling asleep at the desk. The VE then listed the Dictionary of Occupational Titles ("DOT") numbers for the following: accounting clerk, sedentary, skilled, SVP-5; data entry clerk, sedentary, semi-skilled, SVP-4; checker II, sedentary, semi-skilled, SVP-4; general office clerk, light, semi-skilled, SVP-

4; data entry clerk supervisor, sedentary, skilled, SVP-6. The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education, and work history with the ability to perform the following: sedentary work; never climb ladders, ropes, and scaffolds; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; frequently reach, occasionally reach overhead in all directions; no concentrated exposure to humidity vibrations, cold, heat, fumes, odors, dust, gases, pulmonary irritants; avoid all exposure to operational controlled machinery, unprotected heights. The VE testified that such a hypothetical individual could perform all but general office work, which was classified as light. The VE further testified that most jobs in the clerical industry would require very little vocational adjustments. The ALJ asked the VE to consider a second hypothetical individual with the same characteristics as the first but limited to handling and fingering frequently bilaterally. The VE responded that this second hypothetical individual would be precluded from data entry clerk as it would require constant fingering. General office clerk and data entry clerk supervisor would also be precluded. When the ALJ asked if any other work could be identified, the VE responded that billing clerk should be precluded with constant reaching, handling, and fingering. However, appointment clerk, information clerk, correspondence clerk, and cost clerk would not be precluded. (Tr. 56-59)

The VE testified that employers customarily expect one unexcused or unscheduled absence from an employee per month, as well as one 10- to 15-minute break in the morning and one 30- to 60-minute break for lunch. There is generally no tolerance for off-task behavior or unscheduled breaks without accommodation. The ALJ asked the VE to consider a third hypothetical individual with the same characteristics as the first two but who would be off task, falling asleep at the workstation for 5-10 minutes between each scheduled break. The VE responded that such an individual would be precluded from employment. (Tr. 59-60)

Next, counsel asked the VE to reconsider the first and second hypothetical individual but with right dominant upper extremity restricted to occasional for everything. The VE responded that all previously listed jobs require such work. (Tr. 60)

### III. Medical Evidence

Plaintiff claims she is disabled due to multiple impairments. As explained more fully below, the ALJ found that Plaintiff suffers from AFib, COPD, obesity, Meniere's disease, degenerative disk disease, and degenerative right shoulder joint disease. Plaintiff asserts two issues on review: one specifically related to her COPD and one related to opinion evidence mostly of her primary care physician. She has not claimed any error with regard to the ALJ's findings as to her other impairments. Plaintiff's specific arguments concerning her COPD and opinions of her primary care physician are addressed fully below, but the Court nonetheless will detail some of Plaintiff's voluminous medical records.

On June 18, 2015, a cardiologist, Dr. Robert Armbruster, confirmed to Dr. Pozzi that Plaintiff remained in AFib and recommended cardioversion to restore sinus rhythm. (Tr. 380-81) On September 17, 2015, Dr. Armbruster again reported to Dr. Pozzi that Plaintiff had reverted to AFib after cardioversion and wrote "I was hopeful that using CPAP would help keep her in sinus rhythm. She appears to be asymptomatic, and that the ventricular rate is well-controlled." (Tr. 504)

The record includes multiple references to Plaintiff's diagnosis of morbid obesity, which is defined as more than 100 pounds over ideal weight or body mass index. (Tr. 427, 564, 566) It is worth noting that on July 21, 2015, Dr. Pozzi noted Plaintiff had lost fifteen pounds and continued to encourage a low-sodium diet and increased exercise regimen. (Tr. 427)

On October 27, 2015, Plaintiff was diagnosed with vestibular active Meniere's disease,[2] bilateral. (Tr. 562) Dr. Pozzi noted Plaintiff's symptoms were uncontrolled and recommended Plaintiff restart Qnasl spray, which was previously prescribed by an ear, nose, and throat specialist. (*Id.*)

On January 20, 2015, an x-ray revealed mild-to-moderate degenerative endplate changes at the C6-C7 level and mild-to-moderate degenerative facet joint changes were noted throughout the cervical spine. The reviewing doctor noted there was good alignment with note that the visualization of the lower cervical vertebrae was somewhat limited do to shoulder and motion artifact. There was no definite foraminal narrowing and no evidence of fracture. (Tr. 491) An x-ray taken on April 16, 2015, revealed moderate kyphosis and degenerative changes of the thoracic spine. (Tr. 489)

An x-ray of Plaintiff's right shoulder was also taken on January 20, 2015, and revealed mild-to-moderate degenerative changes at the acromioclavicular joint. The reviewing doctor noted "[t]he right shoulder is otherwise unremarkable. No fracture is identified." (Tr. 492)

On June 5, 2015, a treating physician diagnosed Plaintiff with acute congestive heart failure. (Tr. 348) However, an echocardiogram on September 17, 2015 showed normal left ventricular systolic function with an ejection fracture of 65%, which is considered normal. (Tr. 585) Furthermore, Dr. Armbruster's assessment on April 6, 2017, did not note any signs of congestive heart failure. (Tr. 698-702)

On June 19, 2015, a treating physician assessed Plaintiff had acute gout of her right foot. She had been experiencing symptoms for several weeks and was prescribed medication after a recent emergency room visit. The treating physician held off on additional medication at the

---

[2] Meniere's disease is a disorder of the inner ear that can lead to dizzy spells (e.g., vertigo).

time. (Tr. 346, 349) On July 21, 2015, Dr. Pozzi noted Plaintiff's gout was controlled with medication. (Tr. 427)

On June 29, 2015, a sleep study revealed moderate obstructive sleep apnea and noted a CPAP machine could prove beneficial. (Tr. 467)

## IV. The ALJ's Determination

In a decision dated January 11, 2018, the ALJ found that Plaintiff last met the insured status requirements of the Act on December 31, 2016. Plaintiff had not engaged in substantial gainful activity since the amended alleged onset date of April 16, 2015. The ALJ further found that Plaintiff had the following severe impairments during the relevant time period: AFib, COPD, and obesity. The ALJ also gave Plaintiff the benefit of the doubt regarding the severity of Meniere's disease, degenerative disk disease, and degenerative right shoulder joint disease. While Plaintiff did have severe impairments, the ALJ concluded she did not have an impairment or combination thereof that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 20-21)

After careful consideration of the entire record, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. 404.1567(a), subject to limitations. These limitations include inability to climb ladders, ropes, or scaffolds; balance, stoop, crouch, kneel, crawl, or climb ramps or stairs more than occasionally; reach overheard more than occasionally with either upper extremity reach in all other directions more than frequently with her right upper extremity; have concentrated to extreme heat or cold, wetness, humidity, vibrations, and pulmonary irritants; or have any exposure to operational control of moving machinery and unprotected heights. The ALJ did not deny the existence of Plaintiff's symptoms during the relevant time period. However, the ALJ concluded the totality

of relevant medical evidence did not support a finding that Plaintiff's symptoms were disabling under the Act between April 16, 2015 and December 31, 2016. Specifically, the ALJ noted that cardiovascular, respiratory, musculoskeletal, and neurological exams performed by Plaintiff's treating sources between July 2015 and late 2016 regularly, although not always, demonstrated Plaintiff had an irregular heart rhythm and trace lower extremity edema. However, those results did not demonstrate any other deficits or abnormalities other than rare showings of respiratory difficulty and tenderness at the lower spine. (Tr. 22)

In making this finding, the ALJ gave little weight to Dr. Pozzi's opinions. In October 2015, Dr. Pozzi opined that Plaintiff could not perform even sedentary work due to her AFib, COPD, and Meniere's disease. However, the ALJ found that this assessment was not supported by exam results obtained during the relevant time period. In fact, an exam performed by Dr. Pozzi at the time he asserted his opinion showed Plaintiff had a normal heart rate, normal respiration, and an absence of lower extremity edema.[3] (Tr. 23)

In addition to the medical records, the ALJ found that Plaintiff's testimony about her activities for daily living was inconsistent with her claimed inability to walk a long distance. The ALJ also found that the relevant medical records did not support a finding of intensity and frequency of symptoms as Plaintiff required physician intervention for respiratory difficulty only three times (April 2015, June 2015, and September 2016). Furthermore, the ALJ found that the

---

[3] The ALJ also dismissed Dr. Pozzi's assessment of Plaintiff's *left* upper extremity limitations as noted on October 27, 2015. (Tr. 561) Plaintiff assumes Dr. Pozzi mistakenly listed limitations for her left upper extremity instead of her right upper extremity and cites a prior x-ray from January 20, 2015 that showed mild to moderate degenerative changes to her right shoulder. (Tr. 492) Even assuming that Dr. Pozzi intended to suggest limitations due to Plaintiff's *right* upper extremity, the Court does not believe this assessment would have impacted the ALJ's findings and conclusions.

- 10 -

record virtually silent about musculoskeletal symptoms and that medication largely controlled Plaintiff's Meniere's disease. (*Id.*)

Ultimately, the ALJ found the VE's testimony convincing and concluded Plaintiff was able to perform her past relevant work as an accounting clerk and data entry clerk supervisor, as customarily performed in the national economy, between April 16, 2015 and December 31, 2016. Consequently, Plaintiff was not disabled within the meaning of the Act during the relevant time period. (Tr. 23-24)

## V. Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. The Act defines disability "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. *See* 20 C.F.R. § 404.1520(a)(4). Those steps require a claimant to show: (1) that claimant is not engaged in substantial gainful activity; (2) that she has a severe physical or mental impairment or combination of impairments which meets the duration requirement; or (3) she has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) she is unable to return to her past relevant work; and (5) her impairments prevent her from doing any other work. *Id.*

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means less than a preponderance, but sufficient evidence that a reasonable person would find adequate to support the decision." *Hulsey v.*

*Astrue*, 622 F.3d 917, 922 (8th Cir. 2010). "We will not disturb the denial of benefits so long as the ALJ's decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because we might have reached a different conclusion had we been the initial finder of fact." *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011) (citations and internal quotations omitted). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. *See Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment. *Johnson v. Chater*, 108 F.3d 942, 944 (8th Cir. 1997) (citations and internal quotations omitted).

The ALJ may discount a plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. *Marciniak v. Shalala*, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that she considered all the evidence. *Id.*

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to

plaintiff's complaints under the *Polaski*[4] factors and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount the testimony as not credible. *Blakeman v. Astrue*, 509 F.3d 878, 879 (8th Cir. 2007) (citation omitted). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. *Marciniak*, 49 F.3d at 1354.

## VI. Discussion

In her Brief in Support of Complaint, Plaintiff raises two arguments. First, she argues the ALJ failed to properly evaluate her COPD under the applicable requirements in 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 3.02A. Second, she argues the ALJ failed to properly evaluate opinion evidence. The Commissioner responds that the ALJ's determination is supported by substantial evidence. Furthermore, the Commissioner argues the ALJ properly assessed both the severity of Plaintiff's impairments, including COPD, and opinion evidence.

### *(a) COPD Listing*

Listing 3.02 applies to claimants with chronic respiratory disorders due to any cause except cystic fibrosis and who meet one of four criteria listed in subcategories A, B, C, or D. 20 C.F.R. pt. 404, subpt. P, app. 1, § 3.02. To meet Listing 3.02A, a claimant must have taken a

---

[4] The Eight Circuit Court of Appeals "has long required an ALJ to consider the following factors when evaluating a claimant's credibility: '(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.'" *Buckner*, 646 F.3d at 558 (quoting *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009) (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)).

pulmonary function tests, such as a spirometry[5], and obtained a $FEV_1$ reading[6] less than or equal to the value listed in Table I based on the claimant's age, gender, and height without shoes. The record shows, and the parties do not dispute, that Plaintiff is female and sixty-three inches in height. (Tr. 62) Accordingly, to meet Listing 3.02A, she must have an $FEV_1$ value equal to or less than 1.25 obtained during pulmonary function testing. *Id.* at Table I.

The ALJ found that Plaintiff's COPD did not meet the criteria in Listing 3.02. Specifically, the ALJ explicitly noted:

> Listing 3.02 . . . was not met because the medical record does not show the requisite values for one-second for the expiratory volume [3.02A], or forced vital capacity [3.02B], or diffusing capacity for carbon monoxide [3.02C]; nor does it show the requisite number of hospitalizations for an exacerbation [3.02D].

(Tr. 21-22) Plaintiff argues the ALJ failed to specifically mention the April 16, 2015 pulmonary function test, which showed a $FEV_1$ value of 1.18. (Tr. 485) Because this reading is less than the requisite 1.25 in Table I based on Plaintiff's gender and weight, she concludes she meets the requirements of Listing 3.02A.

---

[5] As defined by the regulations concerning respiratory disorders:

> Spirometry, which measures how well you move air into and out of your lungs, involves at least three forced expiratory maneuvers during the same test session. A forced expiratory maneuver is a maximum inhalation followed by a forced maximum exhalation, and measures exhaled volumes of air over time. The volume of air you exhale in the first second of the forced expiratory maneuver is the $FEV_1$. The total volume of air that you exhale during the entire forced expiratory maneuver is the FVC. We use your highest $FEV_1$ value to evaluate your respiratory disorder under 3.02A, 3.03A, and 3.04A, and your highest FVC value to evaluate your respiratory disorder under 3.02B, regardless of whether the values are from the same forced expiratory maneuver or different forced expiratory maneuvers.

20 C.F.R. pt. 404, subpt. P, app. 1, § 3.00(E)(1).

[6] Under the regulations concerning respiratory disorders, "$FEV_1$ means forced expiratory volume in the first second of a forced expiratory maneuver." 20 C.F.R. pt. 404, subpt. P, app. 1, § 3.00(C)(10).

- 14 -

As an initial matter, the ALJ did not commit reversible error by not explicitly referencing the April 16, 2015 pulmonary function test and Plaintiff's results. The Eighth Circuit has held that "an ALJ is not required to discuss every piece of evidence submitted" and "[a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) (alteration in original) (quoting *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)). The ALJ clearly noted that the medical record did not show the requisite values to satisfy Listing 3.02A. Based on the analysis below, the Court finds substantial evidence supports the ALJ's determination.

The Commissioner argues Plaintiff's $FEV_1$ result on April 16, 2015 is invalid. Under the relevant regulations, a person must be "medically stable at the time" of any such pulmonary function test. 20 C.F.R. pt. 404, subpt. P, app. 1, § 3.00(E)(2)(a). For example, a person is not considered "medically stable" when he or she is:

> (i) Within 2 weeks of a change in your prescribed respiratory medication.
> 
> (ii) Experiencing, or within 30 days of completion of treatment for, a lower respiratory tract infection.
> 
> (iii) *Experiencing, or within 30 days of completion of treatment for, an acute exacerbation (temporary worsening) of a chronic respiratory disorder.* Wheezing by itself does not indicate that you are not medically stable.
> 
> (iv) Hospitalized, or within 30 days of a hospital discharge, for an acute myocardial infarction (heart attack).

*Id.* (emphasis added). On the same date of the pulmonary function test, Dr. Pozzi diagnosed Plaintiff with pneumonia. (Tr. 416) Further, Dr. Pozzi's treatment notes indicate Plaintiff sought urgent care just three weeks prior on March 25, 2015 and was prescribed a modified medication regimen. (*Id.*)

The Court agrees with the Commissioner and holds that the ALJ's finding that Plaintiff did not meet the requirements of Listing 3.02A is supported by substantial evidence. Plaintiff's

sole proffered $FEV_1$ result is unreliable under the standards set forth in the relevant regulations as she was experiencing a temporary worsening of her COPD due to pneumonia and recent changes to her medication. Plaintiff's counsel essentially conceded this point at the July 25, 2017 hearing when he noted the sole pulmonary function study was "probably done during a period of exacerbation. So I'm not sure we can rely on that listing level, but it is quite severe." (Tr. 36) Accordingly, the ALJ did not err when he determined Plaintiff failed to meet the requirements of any subcategory in Listing 3.02.

### *(b) Opinion evidence*

Plaintiff contends that the ALJ failed to give sufficient, controlling weight to the opinions of her primary care physician, Dr. Pozzi. She filed her claim for DIB on August 31, 2015. When evaluating claims filed before March 27, 2017, the Commissioner gives "controlling weight" to "a treating source's medical opinion on the issue(s) of the nature and severity of your impairment(s)" if that opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record." 20 C.F.R. § 404.1527(c)(2) ("Generally, we give more weight to medical opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."). Furthermore, the Commission "will always give good reasons" in its final decision for the weight given to a treating source's medical opinion. *Id.*

Here, the ALJ explained he gave little weight to Dr. Pozzi's opinions because the ALJ found that Dr. Pozzi's assessments were not supported by exam results obtained during the

relevant time period. On October 27, 2015, Dr. Pozzi completed forms titled "Medical Assessment for Social Security Disability Claim" (Tr. 559) and "Medical Assessment of Ability to do Work Related Activities" (Tr. 561).[7] In these forms, Dr. Pozzi opined that Plaintiff, among other things, could not lift and carry up to ten pounds during an eight-hour workday; could not stand and/or walk for up to two hours during an eight-hour work day; could only sit for about two hours; and could not use her upper left[8] extremity for frequent reaching, pushing, pulling, grasping, holding, and fine manipulation. (Tr. 561) Based on these assessments, Dr. Pozzi concluded Plaintiff was incapable of sustaining full-time employment at the "sedentary work" level as defined by the Act. (Tr. 559) Nevertheless, the ALJ found that the totality of the relevant medical record did not support Dr. Pozzi's assessment of Plaintiff's disability. Specifically, the AJL noted an exam performed by Dr. Pozzi at the time he asserted his opinion showed Plaintiff had a normal heart rate, normal respiration, and an absence of lower extremity edema. (Tr. 23)

The Commissioner, on the other hand, argues the ALJ properly gave little weight to Dr. Pozzi's opinions and adequately explained his reasons for doing so. As an initial matter, the form titled "Medical Assessment of Ability to do Work Related Activities" is a one-page checklist-style from. (Tr. 561) Additionally, the form titled "Medical Assessment for Social Security Disability Claim" provides pre-typed prompts, which Dr. Pozzi handwrote short responses. In response to the first prompt asking for "[s]ymptomatology and current diagnoses," Dr. Pozzi listed AFib, COPD, and vestibular acute Meniere's disease. (Tr. 559) In response to the second prompt asking for "[s]ummary of supporting clinical, radiological and/or laboratory

---

[7] Based on the transcript, it appears these forms were created by Plaintiff's counsel and sent to Dr. Pozzi. (Tr. 569)
[8] *See supra* note 3.

findings," Dr. Pozzi wrote "See attached." (*Id.*) This response presumably refers to several pages of treatment notes that appear immediately following this form in the transcript, which are addressed below. In response to the third prompt asking "[a]re subjective complaints reasonably consistent with the objective findings," Dr. Pozzi simply wrote "Yes." (*Id.*) Lastly, after proving a brief summary of "sedentary work" as defined by the Act, the third and final prompt asks whether Plaintiff is capable of sustained full-time employment at the "sedentary work" level and explicitly requests "[p]lease briefly state the reason for your answer." (*Id.*) Dr. Pozzi wrote a single word response: "No." (*Id.*)

The Eighth Circuit has "recognized that a conclusory checkbox form has little evidentiary value when it 'cites no medical evidence, and provides little to no elaboration.'" *Anderson v. Astrue*, 696 F.3d 790, 794 (8th Cir. 2012) (quoting *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010)). *See also Taylor v. Chater*, 118 F.3d 1274, 1279 (8th Cir. 1997) ("[RFC] checklists, though admissible, are entitled to little weight in the evaluation of a disability."). Accordingly, the ALJ did not err in giving little weight to these forms and Dr. Pozzi's cursory responses therein.

It bears noting that much of Dr. Pozzi's actual treatment notes from October 27, 2015 appear to be redacted in the transcript. (Tr. 562-63) Plaintiff acknowledges this fact in her Brief in Support of Complaint (ECF No. 12 at 6); however, neither party offers any explanation for why substantial portions of Plaintiff's treating physician's records at issue appear redacted. The Court cannot speculate as to what appears beneath the large black boxes. Consequently, the Court will only consider what is visible.

Dr. Pozzi's notes from October 27, 2015, include Plaintiff's self-reported symptoms. (Tr. 564) In terms of Dr. Pozzi's actual medical opinions, the notes include, in relevant part, cursory

assessments of Plaintiff's AFib, Meniere's disease, and COPD. (Tr. 562-63) He notes Plaintiff's AFib symptoms were "mildly uncontrolled" and prescribed continued use of an inhaler and Singulair. (Tr. 562) Dr. Pozzi further notes Plaintiff's Meniere's disease symptoms were "uncontrolled" and restarted a treatment plan. (*Id.*) As for Plaintiff's COPD, he simply notes Plaintiff was "[n]ot meeting treatment plan goals" and that Plaintiff "should know how to use [her] inhaler." (Tr. 563)

The Commissioner argues, as the ALJ explained, that Dr. Pozzi's assessments are contradicted by his own contemporaneous physical examination results. That same date, October 27, 2015, Dr. Pozzi noted Plaintiff's respiration was normal, her heart rate was regular, and her extremities did not exhibit edema. (Tr. 566) The Court finds that the ALJ was supported by substantial evidence when he gave little weight to Dr. Pozzi's internally inconsistent findings. *See Guilliams v. Barnhart*, 393 F.3d 798, 803 (8th Cir. 2005) ("Physician opinions that are internally inconsistent, however, are entitled to less deference than they would receive in the absence of inconsistencies.").

Furthermore, the Commissioner argues Dr. Pozzi's opinions are improper. In addition to the two forms previously discussed, Dr. Pozzi also submitted a letter dated July 24, 2017 – just one day prior to the hearing before the ALJ. (Tr. 695) This letter, which is addressed "To Whom It May Concern," simply states "It is my professional opinion that Ms. Huskey is disabled and is unable to work do to the following conditions." (*Id.*) He then lists AFib, COPD, and vestibular active Meniere's disease. (*Id.*) The Commissioner argues this July 24, 2017 letter and the forms titled "Medical Assessment for Social Security Disability Claim" and "Medical Assessment of Ability to do Work Related Activities," to the extent they offer opinions on Plaintiff's *ability to work* rather than assessing her medical conditions, improperly invade the

- 19 -

province of the Commissioner. Again, the Court agrees. *See House v. Astrue*, 500 F.3d 741, 745 (8th Cir. 2007) ("A treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no deference because it invades the province of the Commissioner to make the ultimate disability determination.").

Based on this analysis, the Court finds that the ALJ did not commit reversible error and his decision is supported by substantial evidence in the record. It is undisputed that Plaintiff suffered from multiple impairments during the relevant time period. However, that was neither the sole issue before the ALJ nor the issue before the Court now. Based on the totality of the record, the ALJ determined that Plaintiff could perform a range of sedentary work with specified non-exertional limitations due to her multiple severe impairments. The Court finds that substantial evidence supports this conclusion, including the medical records discussed above as well as Plaintiff's and the VE's testimony at the hearing.

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner of Social Security denying Social Security Benefits is **AFFIRMED**. An appropriate Judgment shall accompany this Memorandum and Order.

Dated this 27th day of March, 2020.

RONNIE L. WHITE
UNITED STATES DISTRICT JUDGE